UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

TRACEY R. PERRON,                              No. 2:06-cv-02429-MCE-GGH

        Plaintiff,

   v.                                         MEMORANDUM AND ORDER

SECRETARY, DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

        Defendant.

----oo0oo----

Plaintiff Tracey Perron ("Plaintiff"), a former employee of Defendant Department of Health and Human Services ("DHHS" or "Defendant"), alleges that she was subject to both gender discrimination in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq. and California's Fair Employment and Housing Act ("FEHA"), Government Code §§ 12940 et seq., as a result of favoritism displayed by her direct supervisor at DHHS, James Greer, to another subordinate employee with whom he was having an affair.

///

Plaintiff further contends that she was retaliated against, also in violation of both Title VII and FEHA, for voicing her objection to her supervisor's affair.

Defendant now moves for summary judgment pursuant to Rule 56 on all of Plaintiff's claims. As set forth below, Defendant's motion will be denied.[1]

**BACKGROUND**

Plaintiff was hired as a special agent in Defendant's Sacramento Field Office in approximately 2001. In May of 2004, another special agent, James Greer, was selected as Assistant Special Agent-In-Charge for the region, a position which entailed supervisory responsibility for some 13 special agents located in several field offices, including Sacramento. Greer accordingly became Plaintiff's direct supervisor. Sarah Allen, as the Special Agent-in-Charge of the San Francisco Regional Office, was Greer's supervisor, as well as Plaintiff's second-level supervisor.

In early 2005, after the other two Sacramento special agents left the Sacramento Field Office, two new agents, Pamela Kite and Heather Sowa, began working out of the Sacramento office.

///
///
///

---

[1] Because oral argument would not be of material assistance, this matter was determined to be suitable for decision without oral argument. L.R. 78-230(h).

2

During this period, because of that staffing change, it is undisputed that much of the responsibility for managing the Sacramento office caseload fell to Plaintiff. Def.'s Undisputed Fact ("UF") 3.[2]

Because Special Agents were eligible for cash awards in the late summer based on their performance during the previous year, in mid-July of 2005, Greer prepared award nomination memorandums for the employees who reported to him, including Plaintiff. Those recommendations included a $2,000.00 cash award for Ms. Perron and a $1,500.00 award for Pamela Kite. UF 5. The $2,000.00 request for Plaintiff was the largest award suggested by Greer for any of the Special Agents working under his supervision. Id.

At about the same time, Greer initiated a personal relationship with Ms. Kite that blossomed into a romantic affair by September of 2005. After being told of their relationship by both Greer and Kite on or about September 6 and 7, 2005, Plaintiff questioned Greer about the propriety of his relationship in that regard with a subordinate employee. See Agency's Report of Investigation ("ROI"), 1/15.[3]

///

---

[2] Inasmuch as the Statement of Undisputed Facts contained within Defendant's Opening Points and Authorities was unnumbered, in replying to that Statement Plaintiff sequentially numbered the alleged facts presented. The references to the Undisputed Facts contained in this Memorandum and Order utilize the numbering adopted by Plaintiff.

[3] Citations to the ROI, which forms part of the administrative record and was lodged with the Court, will be made pursuant to the tab and page numbers contained within the ROI. ROI 1/15, for example, refers to page 15 of Tab 1 to the ROI.

3

On September 9, 2005, however, Greer was detailed to New Orleans to assist with Hurricane Katrina relief, as part of a response team organized by Defendant, and aimed at providing protection to other Department of Health and Human Service employees performing health related field works in unsafe areas of New Orleans. UF 14.

Pamela Kite was ultimately selected to accompany James Greer to New Orleans. The parties dispute how that occurred. While Defendant asserts that the ultimate decision was made by Headquarters staff, according to Greer's supervisor, Sarah Allen, Kite's name was initially not on the list of individuals selected by management and was chosen because Greer requested her. Allen Affidavit, ROI, 5/4. Plaintiff claims that she was bypassed for the assignment because of Greer's desire to favor his paramour, Kite.

Although the parties stipulated at Greer's deposition that his relationship with Kite became sexual in nature soon after Kite arrived in New Orleans in early October of 2005 (Greer Dep., 5:18-6:3)[4], and although Greer and Kite stayed in the same motel, Greer denied recommending Kite for the assignment due to any romantic interest, instead assisting that he believed her experience as a Defensive Tactics Instructor and her service on numerous secretarial protection details made her more qualified than Plaintiff, who had also applied for the assignment.

///

---

[4] Hard copies of the Depositions of James Greer, Tracey Perron, Sarah Allen and Heather Sowa were lodged with the Court, in connection with this Motion, in compliance with Local Rule 5-133(i).

1 Greer's supervisor, Sarah Allen, flatly disagreed with this
2 assessment, testifying at deposition that if Greer needed help
3 with administrative matters, "Perron would have been a better
4 selection than Kite." (Allen Dep. 69:19-70:25). Allen also
5 believed that Perron was capable of the security aspects of the
6 New Orleans detail (Id. at 60:12-15), and that "Kite did not
7 perform most if any of the protection mission duties while in New
8 Orleans" in any event. ROI 5/13.

9 In addition to disputing how Kite was chosen over Perron to
10 participate in the Katrina Detail with James Greer, the parties
11 also dispute whether the detail was a desirable assignment.
12 Defendant claims it was not known at the time of selection
13 whether participating agents would receive overtime pay or any
14 type of service for their service. See UF 15. Plaintiff, on the
15 other hand, points to Sarah Allen's testimony that the Detail was
16 considered a "plum" assignment from the very beginning, with
17 management discussing the vetting process "mainly because we knew
18 those people selected would be getting awards and stuff like that
19 based on just the Katrina mission. Allen Dep., 63:2-7.

20 Plaintiff goes on to identify other areas where she
21 purportedly received less favorable treatment than Kite, due to
22 Kite's personal relationship with their mutual supervisor,
23 Greer. In addition to selection for the Katrina Detail,
24 Plaintiff also asserts that she ultimately failed to receive an
25 annual cash award after Greer commenced his relationship with
26 Kite.
27 ///
28 ///

1  While Greer's initial July 2005 award recommendation for the
2  annual award was prior to his romantic involvement with Pamela
3  Kite, and although his initial resubmission of the request was
4  also prior to the commencement of that relationship, Plaintiff
5  claims that she did perform collateral duties that could have
6  subsequently been reported by Greer had he not wished to favor
7  his girlfriend to the exclusion of Plaintiff.  According to
8  Plaintiff, she specifically cited those duties to Greer, who
9  indicated he would include them in a resubmission.  Pl.'s Dep.,
10 240:16-242:4; ROI 11/2-3.  Moreover, Sarah Allen, Greer's own
11 supervisor, herself identified collateral duties performed by
12 Plaintiff that could have been written to justify an award.
13 Allen Dep., 36:21-37:16.  Particularly when coupled with Greer's
14 choice of Kite for the Katrina Detail, these discrepancies raise
15 an issue of fact with respect to whether Greer's failure to
16 follow through with the proper submission was also related to
17 favoritism displayed towards Kite.
18     The final area of disparate treatment identified by
19 Plaintiff concerns her eligibility for a so-called Quality Step
20 Increase ("QSI"). A QSI is a faster-than-normal, within-grade
21 salary used to reward Federal employees for exceptional job
22 performance.  UF 22.  Plaintiff contends that Greer's failure to
23 nominate her for a QSI was a result of his desire to ensure that
24 his girlfriend, Kite, receive any available salary increases.
25 Defendant, on the other hand, alleges that QSIs are rarely
26 awarded and that Greer had never nominated an employee to
27 receive one.
28 ///

6

1    The resulting inference that Plaintiff would not have
2 received such an award irregardless of any desire on the part of
3 her supervisor to favor Kite is, however, less than clear.
4 First, Plaintiff claims that Greer had previously told her that
5 her performance merited a QSI, and that he would nominate her
6 for the award.  Perron Dep., 243:7-21.  Secondly, since Greer
7 had been a supervisor for Defendant less than a year, the fact
8 that he had not previously nominated employees for the award is
9 not surprising.  Finally, Sarah Allen disagreed with the
10 assertion that QSIs were rare, stating that she typically gives
11 out one per year.  Allen Dep., 30:1-16.
12    Because Plaintiff believed the situation involving Greer
13 and Kite was intolerable, she began looking for a new job in the
14 middle of September 2005.  She alleges she was seeking
15 alternative employment at DCIS only to give herself choices in
16 the event that the DHHS office environment did not improve,
17 through, for example, either Kite or Greer transferring out of
18 Sacramento.  When DCIS Supervisor Scott Mumper contacted Greer
19 about Plaintiff's prospective employment with DCIS, Mumper
20 claims that Greer gave a negative recommendation and instead
21 suggested that his alleged paramour, Kite, be considered for the
22 position.  Mumper proceeded to accuse Greer, in the course of a
23 heated conversation, of being disingenuous about his effort to
24 secure Kite's relocation so that their affair could continue
25 unimpeded.
26 ///
27 ///
28 ///

7

1    Although Plaintiff claims her subsequent acceptance of the
2 DCIS position in mid-October was still with the hope that the
3 DHHS office atmosphere would in fact allow her to stay, that
4 hope apparently failed to materialize.  On November 8, 2005,
5 after Greer and Kite returned from New Orleans, Plaintiff
6 complained to Greer in an email about the uncomfortable
7 environment created by the affair and told him that the
8 situation had to be addressed.  Plaintiff alleges she also
9 complained verbally to Greer later in November 2005.  According
10 to Plaintiff, after Greer and Kite returned from New Orleans,
11 they worked from home on the same days, took extended breaks
12 together, were overheard giggling together in their offices.
13    On December 7, 2005, Plaintiff reported the affair to a
14 superior for the first time when she spoke with Sarah Allen.
15 Allen had contacted Plaintiff in Mid-October because she
16 believed Plaintiff appeared to be upset, and Plaintiff told
17 Allen she thought Kite was not performing all of her job duties
18 and that Plaintiff was not receiving the assistance she needed
19 for her cases.
20    Plaintiff ultimately resigned on or about December 12, 2005
21 to commence employment with DCIS after her concerns about DHHS
22 were allegedly left unaddressed.  She subsequently instituted
23 the present lawsuit.
24 ///
25 ///
26 ///
27 ///
28 ///

8

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the moving party

> "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Rule 56(c).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-587 (1986); First Nat'l Bank v. Cities Ser. Co., 391 U.S. 253, 288-289 (1968).

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.

9

1  Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that
2  the fact in contention is material, i.e., a fact that might
3  affect the outcome of the suit under the governing law, and that
4  the dispute is genuine, i.e., the evidence is such that a
5  reasonable jury could return a verdict for the nonmoving party.
6  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52
7  (1986); Owens v. Local No. 169, Assoc. of Western Pulp and Paper
8  Workers, 971 F.2d 347, 355 (9th Cir. 1987).  Stated another way,
9  "before the evidence is left to the jury, there is a preliminary
10 question for the judge, not whether there is literally no
11 evidence, but whether there is any upon which a jury could
12 properly proceed to find a verdict for the party producing it,
13 upon whom the onus of proof is imposed."  Anderson, 477 U.S. at
14 251 (quoting Improvement Co. v. Munson, 14 Wall. 442, 448, 20 L.
15 Ed. 867 (1872)).  As the Supreme Court explained, "[w]hen the
16 moving party has carried its burden under Rule 56(c), its
17 opponent must do more than simply show that there is some
18 metaphysical doubt as to the material facts ... Where the record
19 taken as a whole could not lead a rational trier of fact to find
20 for the nonmoving party, there is no 'genuine issue for trial.'"
21 Matsushita, 475 U.S. at 586-87.
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

**ANALYSIS**

**I.  GENDER DISCRIMINATION**

Discrimination on the basis of sex is prohibited under both Title VII and California's FEHA.  Title VII of the Civil Rights Act makes it illegal for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex."  42 U.S.C. § 2000e-2(a)(1).  FEHA contains virtually identical provisions.  Cal. Gov. Code § 12940(a).  A plaintiff may establish prohibited sex discrimination by proving disparate treatment or disparate impact on the basis of gender.  See Sischo-Nownejad v. Merced Comm. Coll. Dist., 934 F.2d 1104, 1109 (9th Cir. 1991).  Both Federal courts as well as California courts have adopted similar standards for discrimination claims, hostile work environment sexual harassment claims and retaliation claims under Title VII and FEHA.  See, e.g., Lyle v. Warner Bros. TV Prods., 38 Cal. 4th 264, 279 (2006); Fisher v. San Pedro Peninsula Hosp., 214 Cal. App. 3d 590, 608 (1989).

Under the so-called McDonnell-Douglas test for Title VII and FEHA discrimination claims, the Plaintiff can establish a prima facie of sex discrimination by 1) demonstrating performance in accordance with her employer's legitimate expectations; (2) showing that she suffered an adverse employment action, and (3) establishing the presence of circumstances indicative of a discriminatory motive.
///

1  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-803 (1973);
2  see also Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th
3  Cir. 1998).  The amount that must be produced in order to create
4  a prima facie case, however, is "very little."  Sischo-Nownejad,
5  934 F.2d at 1111.

6       Once plaintiff establishes a prima facie case of
7  discrimination, the burden shifts back to the defendant to
8  articulate a legitimate nondiscriminatory reason for the adverse
9  employment action.  McDonnell Douglas, 411 U.S. at 802-803.  If
10 defendant meets its burden in that regard, the burden shifts
11 back to plaintiff to establish that defendant's proffered reason
12 was a pretext for discrimination.  See St. Mary's Honor Ctr. v.
13 Hicks, 509 U.S. 502 (1993).

14      Defendant first asserts it is entitled to summary judgment
15 on Plaintiff's gender discrimination claim, arguing that
16 Plaintiff fails to even establish a prima facie case.  Defendant
17 primarily bases this contention on the argument that Plaintiff
18 is unable to identify the requisite adverse employment needed to
19 state a viable claim.  Secondarily, Defendant also asserts that
20 the circumstances surrounding this matter, and particularly the
21 timing of events involving Plaintiff, militates against any
22 finding of discriminatory motive on the part of James Greer.

23      In its previous Memorandum and Order filed November 29,
24 2007, the Court carefully explained that where a supervisor's
25 preference for his or her paramour is transformed from simple
26 favoritism to the concrete bestowal of tangible, economically
27 valuable employment benefits denied other employees, such
28 conduct can constitute prohibited discrimination.

12

1  See November 29, 2007 Order, p. 14; see also 29 C.F.R.
2  § 104.11(g).  Defendant nonetheless contends, through this
3  Motion, that Plaintiff has no evidence supporting any such
4  adverse employment action, and that consequently she cannot as a
5  matter of law maintain a viable claim action.  Plaintiff opposes
6  summary judgment in this regard on grounds that she in fact
7  suffered three such adverse actions: 1) her failure to receive
8  an annual special award; 2) her supervisor's selection of his
9  paramour, Pamela Kite, for the desirable Katrina Detail; and
10 3) James Greer's failure to nominate her for a QSI.  Plaintiff
11 further points to circumstances surrounding all three of these
12 actions as evincing Greer's discriminatory intent.
13     As the previous Background section of this Memorandum and
14 Order makes clear, numerous triable issues of fact exist with
15 respect to whether all three actions were adverse, not to
16 mention whether Greer's motives were discriminatory in nature.
17 First, with respect to the annual special award, there is a
18 dispute with regard to whether Plaintiff's collateral duties
19 warranted such an award, with evidence from Greer's own
20 supervisor, Sarah Allen, indicating that such duties on Perron's
21 could have been identified by Greer in resubmitting an award
22 memorandum, and Greer himself agreeing to resubmit the memo
23 citing to such duties, then in fact failing to do so.
24 ///
25 ///
26 ///
27 ///
28 ///

13

1  Second, there is a clear factual dispute regarding whether the
2  Katrina Detail was viewed as a desirable and/or lucrative
3  assignment from the onset, and whether Plaintiff's qualification
4  bested those of Pamela Kite, with the inference being that Greer
5  wished to take his paramour to New Orleans in order to further
6  their personal relationship.  The timing alone of Greer's
7  selection when coupled with the onset of his romantic
8  relationship with Kite certainly supports this inference.
9  Finally, there is equally conflicting evidence on whether
10 Plaintiff could, or should have been, selected for a QSI.
11 Plaintiff suggests that Greer's failure to nominate Plaintiff
12 for a QSI was linked to his desire to instead secure a promotion
13 from GS-12 to GS-13 for his girlfriend, Kite.  See Allen Dep.,
14 89:4-16.  According to Plaintiff, Greer specifically told her he
15 had already prepared the paperwork requesting a QSI on her
16 behalf.  ROI, 11/1.  The fact that no such request was
17 apparently made itself may suggest some discriminatory motive on
18 Greer's part.
19      Significantly, to the extent that Plaintiff has established
20 a prima facie case and the burden shifting contemplated by
21 McDonnell-Douglas proceeds, these same disputes also pose
22 triable issues with regard to whether any legitimate, non-
23 discriminatory reasons posited by Greer for his actions were in
24 fact mere pretext for unlawful discrimination.
25      Because resolution of all these questions goes beyond the
26 purview of summary judgment, Defendant's request for summary
27 adjudication of Plaintiff's gender discrimination claim must be
28 denied.

14

**II. RETALIATION**

Plaintiff also claims that the adverse employment actions were not only discriminatory but also constituted actionable retaliation in violation of Title VII as well as FEHA. In order to establish a claim of retaliation thereunder, the Plaintiff must demonstrate (1) that she engaged in a protected activity; (2) that her employer was aware of the activity; (3) that she suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action. Raad v. Fairbanks North Star Borough Sch. Dist., 323 F.3d 1185, 1197 (9th Cir. 2003); see also Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005).

Plaintiff's retaliation claim survives summary judgment on grounds similar to the disputed issues identified above that preclude summary judgment as to her gender discrimination claim. Just as Greer's actions may have been an attempt to impermissibly confer tangible employment benefits on his paramour, and to consequently discriminate against Plaintiff, Plaintiff presents an equally plausible argument that his actions could be construed by the trier of fact as retaliation against her for voicing her opposition to his affair with Ms. Kite. Plaintiff specifically refers to her conversation with Greer on September 7, 2005, and her subsequent complaints to Greer about the ongoing situation involving Ms. Kite, as constituting the requisite protected activity for purposes of her retaliation claim.

///

Greer himself does not dispute that Plaintiff repeatedly complained about the impropriety of his relationship with Kite as a subordinate employee.  See Greer Affid., ROI 10/11, ¶ 40.

An employee's conduct may constitute protected activity for purposes of a retaliation claim not only when the employee opposes conduct that ultimately is determined to be unlawful, but also when the employee opposes conduct that the employee reasonably and in good faith believes is unlawful, whether or not that belief is ultimately borne out.  Yanowitz, 36 Cal. 4th 1028 (internal citations omitted).  Given that standard, the Court cannot rule out that Plaintiff engaged in protected activity for purposes of summary judgment.

With respect to whether she sustained an adverse employment action, Plaintiff claims, as already discussed above, that Greer failed to submit appropriate documentation in support of a performance awards and QSI, despite agreeing to do so. Plaintiff further contends that Greer made derogatory comments to DCIS in an attempt to prevent her from securing a new position.  As noted in the Court's previous Order, these allegations are sufficient to constitute an adverse employment action for purposes of stating a viable retaliation claim.

The more difficult inquiry identified by Plaintiff concerns whether the adverse employment actions are causally related to her protected activity.  "The causal link between a protected activity and the alleged retaliatory action 'can be inferred from timing alone' when there is a close proximity between the two." Id. (citing Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002)).

16

All of these events identified by Plaintiff took place during an approximately four-month period.  The Plaintiff has referred to several instances of protected activity, and several instances of alleged retaliation that occurred during this period.  The Court must view the facts before it and draw all reasonable inferences in favor of the non-moving party.  Applying that standard, the Court can find a reasonable inference of causal effect between Plaintiff's experiences of adverse employment and her protected activity.

The Plaintiff has sufficiently established a close proximity between the activities in order to survive a motion for summary judgment as to her retaliation claim.

**III.  CONSTRUCTIVE DISCHARGE**

Although Defendant concedes that Plaintiff has failed to assert a claim for constructive discharge in her Complaint, it nonetheless asks the Court to adjudicate the merits of the claim "should the court determine that Plaintiff has raised a cause of action for constructive discharge." Def.'s Mot., 20: 12-13.  In the absence of a stated claim for constructive discharge at this juncture, the Court declines to rule on the propriety of that cause of action.  Plaintiff must take steps to amend her complaint to include a claim for constructive discharge before that claim is properly before the Court. Any such amended complaint must be filed not later than twenty (20) days from the date this Memorandum is filed or any claim of constructive discharge will be presumed to be abandoned.

17

**CONCLUSION**

For all the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

Dated: December 1, 2008

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE